**KICKAPOO TRIBE OF INDIANS, et al., Plaintiffs,**

v.

**Bruce BABBITT, et al., Defendants.**

**Civ. A. No. 92–1187 (RCL).**

United States District Court, District of Columbia.

July 13, 1993.

**38**

Glenn M. Feldman, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.C., Phoenix, AZ, for Kickapoo Tribe.

Lance W. Burr, Atty. Gen., Kickapoo Tribe, Lawrence, KS, for Kickapoo Tribe.

Edward J. Passarelli, Dept. of Justice, Washington, DC, for defendants.

William B. McCormick, Office of the Governor, Topeka, KS, for Gov. Finney.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

Plaintiffs in this action are the Kickapoo Tribe of Indians, whose reservation lies within the borders of the State of Kansas; Steve Cadue, the Chairman of the Kickapoo Tribe; and Joan Finney, the Governor of the State of Kansas. Plaintiffs seek two forms of relief: a declaratory judgment that since the Assistant Secretary of the Interior for Indian Affairs failed to act on a Tribal–State compact originally signed by Chairman Cadue and Gov. Finney on January 16, 1992, and modified by them on March 2, 1992, within 45 days of its submission, the compact should be considered to have been approved under the Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d)(8)(C); and a writ of mandamus directing the Secretary to publish notice of the Tribal–State compact in the *Federal Register* pursuant to 25 U.S.C. § 2710(d)(8)(D).[1]

Defendants are Bruce Babbitt,[2] the Secretary of the Interior; and Eddie Brown, the Assistant Secretary of the Interior for Indian Affairs. Each is sued in his official capacity.

### I. BACKGROUND.

Plaintiffs have moved for summary judgment; defendants have moved to dismiss the complaint or, in the alternative, for summary judgment. However, before addressing the merits of these motions, the court first examines the Indian Gaming Regulatory Act ("IGRA"), passed by Congress in 1988; and the unique chronology of events which led to this suit.

### A. IGRA.

After the Supreme Court held that states could not unduly impede gaming on Indian lands, *Cabazon Band of Mission Indians v. California*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), the quantity and extent of gaming on Indian lands quickly grew. Congress became concerned that the proceeds of this gaming were not benefiting the tribal governments and their constituents; in addition, Congress wanted to ensure that organized crime was not allowed to acquire a stake in Indian gaming. Congress' response to these concerns was IGRA, the Indian

---

1. Defendants have not contested plaintiffs' standing to bring this suit. Any such contest would be futile, however, as plaintiffs' allegations demonstrate that the actions (not) taken by defendants have injured them. This court has jurisdiction pursuant to 28 U.S.C. § 1331. Venue in this court is proper pursuant to 28 U.S.C. § 1391(e).

2. Secretary Babbitt has been substituted for former Secretary of the Interior Manuel Lujan, Jr., the original named defendant.

Gaming Regulatory Act, codified at 25 U.S.C. §§ 2701–21.

IGRA divides gaming into three classes: class I gaming, which is limited largely to social gaming for minor prizes, is left entirely to the discretion of the tribes; class II gaming, which includes bingo and bingo-type games as well as non-banking card games, also is under the jurisdiction of the tribes, but is subject to some oversight by the National Indian Gaming Commission (also established by IGRA); and class III gaming, which includes any gaming which does not fall into class I or class II. Class III gaming is prohibited until the tribe and the appropriate state complete a Tribal–State compact allowing for such games. This compact must be submitted to the Secretary of the Interior, who must approve or reject the compact within forty-five days and then publish notice of the compact in the *Federal Register;* the compact is considered to have been approved if the Secretary fails to act within the allotted forty-five days.[3]

B. *Chronology.*

On August 28, 1991, the Kickapoo Tribe made a formal request that the State of Kansas negotiate a Tribal–State compact covering class III gaming.[4] Gov. Finney entered into negotiations with the Kickapoo Tribe, and on January 16, 1992, Steve Cadue, the Chairman of the Kickapoo Tribe, and Gov. Finney signed a Tribal–State compact. The Tribe immediately forwarded the document to Eddie Brown, the Assistant Secretary of the Interior for Indian Affairs, for approval.

However, on January 17, 1992, Robert T. Stephan, the Attorney General of Kansas, sent a letter to Secretary of the Interior Manuel Lujan that insisted that Gov. Finney did not have the authority under the laws of Kansas to enter into the Tribal–State compact. Gov. Finney countered this suggestion in her own letter to Secy. Lujan dated January 31.

Attorney General Stephan filed a suit in the Supreme Court of Kansas on February 5, 1992, requesting a determination as to whether the Governor possessed the power to enter into a compact with the Kickapoo Tribe. *Kansas v. Finney,* 251 Kan. 559, 836 P.2d 1169.

While that suit was pending, Asst. Secy. Brown returned the Tribal–State compact on February 28, 1992, stating that the compact was in violation of IGRA as to one point. Immediately, the Kickapoo Tribe and Gov. Finney amended the compact and returned the modified compact to Asst. Secy. Brown on March 2, 1992. Asst. Secy. Brown received the amended compact, now in compliance with IGRA, on March 5, 1992.

When he received the amended compact, Asst. Secy. Brown sent a letter dated March 8 to the Kickapoo Tribe with a copy to Gov. Finney. In that letter, Asst. Secy. Brown acknowledged that the Department of the Interior was "prepared to approve" the compact. However, he stated that the Department was "not in a position to decide th[e] state issue" as to who has authority to bind the State of Kansas; since that question was then pending before the Supreme Court of Kansas, Asst. Secy. Brown asserted that the

---

3. (A) The Secretary is authorized to approve any Tribal–State compact entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe.
(B) The Secretary may disapprove a compact described in subparagraph (A) only if such compact violates—
(i) any provision of this chapter,
(ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or
(iii) the trust obligations of the United States to Indians.
(C) If the Secretary does not approve or disapprove a compact described in subparagraph (A) before the date that is 45 days after the date on which the compact is submitted to

the Secretary for approval, the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter.
(D) The Secretary shall publish in the Federal Register notice of any Tribal–State compact that is approved, or considered to have been approved, under this paragraph.
25 U.S.C. § 2710(d)(8).

4. IGRA provides that a state's failure to negotiate in good faith or to complete a compact within 180 days of a formal request create a cause of action on behalf of the requesting Indian tribe in the United States District Court.

Department did "not deem the compact to have been submitted as the term is used in 25 U.S.C. § 2710(d)(8)." Thus, he concluded, the forty-five day period within which the Secretary has authority to act would not begin until the Supreme Court of Kansas had rendered its decision in *Kansas v. Finney.*

On May 19, 1992, plaintiffs brought this suit seeking a declaration that the compact was now approved as a matter of law as forty-five days had passed since Gov. Finney and the Kickapoo Tribe had submitted their compact to the Department of the Interior; and requesting a writ of mandamus directing defendants to comply with IGRA and publish the compact in the *Federal Register.*

On July 10, 1992, before the parties in this suit began to brief their cross-motions for summary judgment, the Supreme Court of Kansas ruled that while the Governor possessed the power to negotiate a compact with the Kickapoo Tribe, she did not have the power to sign the resulting compact. *Kansas v. Finney,* 251 Kan. 559, 836 P.2d 1169 (1992).

Relying on the decision of the Supreme Court of Kansas, Acting Asst. Secy. William D. Bettenberg that same day returned the compact to Chairman Cadue unapproved.

Plaintiffs filed a motion for summary judgment; defendants have moved to dismiss or, in the alternative, for summary judgment. Oral argument on all motions was held in open court on July 2, 1993.

## II. DISCUSSION.[5]

Plaintiffs' contentions are simply stated: *First,* that Asst. Secy. Brown had no authority to defer his approval of the Tribal–State compact until after the Supreme Court of Kansas ruled; under IGRA, 25 U.S.C. § 2710(d)(8)(C), plaintiffs assert, Asst. Secy. Brown had to approve or disapprove of the compact within forty-five days. *Second,* as Asst. Secy. Brown failed to take action on the compact within forty-five days, the default provision included in § 2710(d)(8)(C) applies, and the compact should be considered to

have been approved as of April 20, 1992. And *third,* Since the compact is considered approved, defendants must publish notice to that effect in the *Federal Register* pursuant to 25 U.S.C. § 2710(d)(8)(D).

Defendants' arguments are also easily summarized: *First,* that plaintiffs have failed to join an indispensable party, the State of Kansas, as a defendant in this suit; this failure, defendants warrant, mandates a dismissal of plaintiffs' cause of action pursuant to Fed.R.Civ.P. 19. *Second,* even if the suit is not dismissed, defendants claim that the Governor's powerlessness to enter into the Tribal–State compact renders that compact void. Since the compact was a legal non-entity, defendants posit, no executed Tribal–State compact was ever properly submitted to the Department of the Interior; without a valid submission, the forty-five day statutory approval period never began; without that statutory deadline, no default provision could be reached. Thus, defendants conclude, there is no valid Tribal–State compact between the State of Kansas and the Kickapoo Tribe, and summary judgment should be entered for defendants.

In Part A., the court rejects defendants' first argument and finds that the State of Kansas is not an indispensable party; thus, this action must proceed. In Part B., the court agrees with plaintiffs' first two arguments, finding not only that defendants had a mandatory, unambiguous duty to approve or disapprove the compact within forty-five days, but also that defendants' failure to act triggers the statutory approval mechanism of § 2710(d)(8)(C). However, although the compact is deemed approved under that provision, it is nonetheless void as it was never lawfully entered into by the State of Kansas. *See* Part C. Thus, plaintiffs' motion for summary judgment must be denied as none of plaintiffs' requested relief may be granted; defendants' motion for summary judgment must be granted.

### A. *The State of Kansas is not an Indispensable Party under Fed.R.Civ.P. 19.*

■ The first half of defendants' motion is to dismiss plaintiffs' complaint for failure to

---

**5.** This case is ideally suited for summary judgment under Fed.R.Civ.P. 56(e). There are no issues of fact whatsoever, much less a genuine

issue as to any material fact. Rather, at issue is one question of law, to which the court now turns.

join an indispensable party, the State of Kansas, under Fed.R.Civ.P. 19. The court finds that the State is not an indispensable party, and thus defendants' motion is denied.

Rule 19 establishes a two-prong test, both parts of which must be met before a court may dismiss plaintiffs' complaint for failure to join an indispensable party. First, the court must determine that the absent party is a necessary party under Rule 19(a); second, the court must find that the absent person should be regarded as indispensable and thus that the person's absence warrants dismissal of the action.

For purposes of this discussion, the court will assume that the State of Kansas is a necessary party under Rule 19(a)(2). Under that Rule,

> A person ... shall be joined as a party in the action if ... (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(b).[6] The court will assume—without deciding—that the State of Kansas does have an interest[7] which may be impaired in this suit and thus that this prong of the Rule 19 test is satisfied.

However, even if the State were to be considered a *necessary* party under Rule 19(a), the court holds that it is not an *indispensable* party under Rule 19(b). Rule 19(b) lists four non-exclusive factors to be considered by the court in determining whether a party is indispensable:

first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b). When the court weighs these factors "in equity and good conscience," it finds that the State of Kansas is not an indispensable party.

1) The first factor, prejudice to the State of Kansas,[8] is the closest issue; the court finds that the State of Kansas would be prejudiced if the court were to grant plaintiffs the relief they seek. If the court grants relief, the State of Kansas will be bound to a compact that was not approved in accordance with Kansas law. Being forced to abide by an allegedly unlawful compact does serve to prejudice the interests of the State.

However, that prejudice is mitigated by several factors. First, the court notes that the State of Kansas has notice of this suit (at the least, they are aware of this case as it is referenced in the Supreme Court of Kansas' opinion) yet chose not to intervene in this suit. The court can only assume that the State did not feel that its interest was of a magnitude worth protecting.

Second, granting plaintiffs the relief they seek will only subject the State of Kansas to obligations already agreed to by its Governor, an officer of the state popularly elected by the people of Kansas. The Tribal–State compact was signed by Gov. Finney and Chairman Cadue only after long negotiations. And, the Department of the Interior has

---

6. Joinder may also be ordered under Rule 19(a)(1), that complete relief is impossible without the absent party, but defendants have not claimed that this part of the rule applies to the present case.

7. If the court were to hold the compact to be valid and effective, the State would be bound by that compact; therefore, the State's interest in regulating gaming within its borders arguably is implicated by this suit.

8. The rule also asks whether those already parties will also be prejudiced. Since defendants would be required to fulfill their statutory duties regardless of whether the State were a party to the action, defendants will not be prejudiced by the court's decision that the State is not an indispensable party.

determined that the compact is in compliance with the provisions of IGRA. Thus, no relief this court could give would subject the State to any burden not already accepted by the State's highest elected executive official or not already countenanced by Congress.

Nonetheless, the State of Kansas would be subject to the provisions of the compact, and the State is prejudiced in its ability to oversee gaming conducted within its borders. Given the facts just recited, the court finds that this prejudice is insufficient by itself to warrant dismissal of plaintiffs' cause of action; rather, it must be weighed against the other factors set forth in Rule 19(b).

2) The second factor concerns whether the court may shape the relief it grants so as to lessen or avoid the prejudice. Given the nature of the relief plaintiffs seek and this court's lack of jurisdiction over the State of Kansas, there is no way the court can avoid the prejudice defendants claim.

3) However, the third factor, the adequacy of relief, clearly favors plaintiffs. The relief plaintiffs seek is that the compact be deemed approved (according to law) and that defendants be ordered to publish notice of that approval (again, according to law). This court has power to award plaintiffs complete relief with or without the State of Kansas as a party-defendant.

4) Finally, the fourth criterion likewise favors plaintiffs. (This may well be the most important factor in this case.) The court finds that dismissal of this suit will necessarily leave plaintiffs without any remedy. Plaintiffs' injury has been caused not by the State of Kansas but by defendants, federal government agents who have failed to fulfill their statutory responsibilities. Thus, the only way plaintiffs may redress this injury is in this action against defendants.[9]

In addition, this suit might be the only means by which plaintiffs may obtain their ultimate goal, a compact with the State of Kansas allowing them to conduct class III gaming. The Kickapoo Tribe has brought suit in the United States District Court for the District of Kansas seeking a determination that the State of Kansas has not negotiated a compact in good faith as required by IGRA. *Kickapoo Tribe v. Kansas*, No. 92–4233–SAC, 1993 WL 192795 (D.Kan.). The State has vigorously contested the suit, initially moving to dismiss the action on sovereign immunity grounds. The district court denied that motion in an opinion dated March 29, 1993. However, the State now has appealed that decision to the Eighth Circuit Court of Appeals, and all proceedings in the district court have been stayed pending the outcome of that appeal. Even if the Kickapoo Tribe was to win that suit, however, it would still be subject to the negotiation and mediation procedures of 25 U.S.C. § 2710(d)(7), and there is no guarantee that the resulting compact, whenever it is completed, would be as favorable to plaintiffs as the present compact. Given Kansas' poor history in this matter, it is unlikely that plaintiffs will see any relief in the near term in any forum—judicial or otherwise—outside of this court.

5) Finally, the court looks to a few factors which are not specifically enumerated in the Rule, but which are relevant to making a determination "in equity and good conscience." First, the Kickapoo Tribe first requested that the State negotiate a compact in August 1991, thus triggering IGRA's 180–day deadline. After Gov. Finney and Chairman Cadue signed the Tribal–State compact here at issue, Attorney General Stephan sent a letter to Secretary Lujan requesting not only that the compact be disapproved, but also that the legislature be given an opportunity to negotiate a compact with the Kickapoo Tribe. However, the legislature did not negotiate a compact, and even after the Supreme Court of Kansas ruled that the Governor did not have the authority to enter into the compact, there is no indication that the legislature stepped in to fill the void. Now,

---

**9.** Defendants' argument that plaintiffs could have appealed the decision of the Supreme Court of Kansas is irrelevant on two points: first, because the decision of the Supreme Court of Kansas is irrelevant to this court's determination under federal law of whether the compact was properly before the Secretary of the Interior (see Part II.B. and II.C., below); and second, because a different result in that suit would not redress the injury plaintiffs have suffered at the hands of defendants: statutory violations by federal officials.

nearly two years later, defendants ask the court to dismiss plaintiffs' complaint, thus leaving the Kickapoo Tribe without the ability to conduct class III gaming for an indefinite period of time (not to mention leaving plaintiffs without a remedy for defendants' violations of their statutory duties). Congress' intent when it passed IGRA was clear: "to promote tribal economic development, tribal self-sufficiency, and strong tribal government." 25 U.S.C. § 2701(4). *See also* § 2702(1). This goal has already been thwarted for nearly two years, and it is inequitable to force further delay upon plaintiffs when the State of Kansas, the ostensible indispensable party, has successfully circumvented the express purpose of IGRA to the detriment of the Kickapoo Tribe.[10]

Second, the court notes that the Tribal–State compact has been signed by the Governor of Kansas, the highest ranking elected executive official in the state. As a representative of the people of the State, the Governor—it is assumed—had the best interests of the State in mind when she negotiated and approved the compact. Thus, it is hard for the court to find that the State will be prejudiced when it implements a policy approved by the Governor while she was acting on behalf of the people of the State.

In conclusion, the court finds that the factors which might weigh in favor of defendants are insufficient, when taken together, to warrant dismissal of the action. However, the fourth enumerated factor (adequacy of alternative remedies) and the other non-enumerated factors, *even standing alone,* all justify proceeding even without the joinder of the State of Kansas. Unless the court were to entertain this lawsuit, plaintiffs would have no opportunity to challenge the allegedly wrongful acts of the federal agents and Congressional intent would be further thwarted.

Therefore, even if the State of Kansas were a necessary party under Rule 19(a)(2), an issue the court does not decide, the court finds that "in equity and good conscience the action should proceed. . . ." Rule 19(b). The State of Kansas is not an indispensable party: it will suffer little—if any—prejudice by the relief plaintiffs seek, and the court finds that the other factors clearly weigh in favor of proceeding with, not dismissing, this action. Therefore, defendants' motion to dismiss will be denied.

B. *The Compact is Considered to have been Approved by the Assistant Secretary's Failure to Act.*

█ Having decided that the case should proceed, the first question the court must face is whether the compact is deemed approved due to defendants' failure to act on the compact within forty-five days. Congress set forth a mandate in 25 U.S.C. § 2710(d)(8) that is, for once, remarkably clear.[11] The statute gives the Secretary the authority to approve Tribal–State compacts, § 2710(d)(8)(A), a permissive authority that then is qualified in § 2710(d)(8)(B). The Secretary may disapprove a compact only for one (or more) of three deficiencies: a violation of IGRA; a violation of another Federal law; or a violation of the trust obligations of the United States. In the absence of one of these violations, therefore, the Secretary *must* approve the compact. More important to this case, Congress was greatly concerned that the Secretary might not pass on the compacts quickly; thus, it also stated that the compact would be deemed approved, with or without the Secretary's approval, if the Secretary failed to act within forty-five days of the submission of the compact. § 2710(d)(8)(C). Thus, whenever the Secretary receives a compact, he must act on it within forty-five days or it is deemed approved.

In this case, the amended compact was received by the Secretary on March 5, 1992. To fulfill the statute's requirements, then, the Secretary had to act on the compact by April 20, 1992. He did not, however, and the compact was not rejected until July 10, 1992.

---

**10.** This is particularly true given the State of Kansas' use of a sovereign immunity defense in the District Court proceedings in Kansas. Some element of the equitable "clean hands" defense would seem to apply.

**11.** *See* note 3, above, for the text of the statute.

Under this plain reading of the statute, therefore, the compact was considered to have been approved as of April 20, 1992.

Defendants interpose several arguments as to why the court should not enforce this plain reading of IGRA, an unambiguous statute (at least with respect to this portion of the statute). First, defendants assert that the court must give deference to defendants' determination that the state had not unequivocally entered into the compact. Second, defendants claim that the Supreme Court of Kansas' ruling that the Governor did not have authority to bind the state means that no compact was ever "submitted" to the Department of the Interior.

Defendants' assertions are not persuasive. If the Secretary wanted to hold that Gov. Finney's approval was insufficient to form a compact, he could have done so. However, to do so, he had a statutory obligation to disapprove the compact for a legally valid reason under § 2710(d)(8)(B) within forty-five days of the submission of the compact. In short, the statute does not allow for tolling due to uncertainty within the Department of Interior.[12] Therefore, the Secretary's determination that the forty-five day approval period was tolled until the Supreme Court of Kansas handed down its ruling in *Finney* is contrary to unambiguous law and deserving of no discretion from the court.[13]

In short, defendants were bound by the statutory requirements of IGRA. Regardless of whether the governor had the authority to bind the state, defendants had an obligation to approve or disapprove of the compact within forty-five days; they did not. Instead, they attempted to postpone acting on the compact pending outside events, an act not tolerated by IGRA. As a result of defendants' failure to act, therefore, § 2710(d)(8)(C) applies, and the compact is considered to have been approved by the Secretary as of April 20, 1992.

C. *The Compact, though Consistent with IGRA, was not Entered into by the State of Kansas; therefore, it may not be Considered Approved in its Entirety.*

■ The fact that the compact is deemed approved, however, does not mean that the compact necessarily is binding and operational. Rather, as defendants next argue, even if the compact is deemed approved, it nonetheless may be void if the Governor's inability to bind the State of Kansas renders the compact invalid. Since § 2710(d)(8)(C) states that the compact is deemed approved "only to the extent the compact is consistent with the provisions of this chapter [i.e., IGRA]," if the compact conflicts with any provision of IGRA, the fact that the Secretary failed to act within the forty-five day approval period is irrelevant; the compact still would be void.

■ The court finds that the determination of the validity of a Tribal–State compact, signed by the Governor of Kansas apparently without lawful authority under the Kansas constitution, is a federal question. *See Dyer v. Sims*, 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713 (1951) (validity of interstate compact

---

**12.** The omission of any type of tolling provision is certainly not an oversight on the part of Congress. By including the forty-five day limitation, Congress clearly was attempting to ensure that the Secretary would not be able to delay approval of Tribal–State compacts indefinitely, thus frustrating Congress' intent with IGRA. (Congress has all too often seen its goals left unobtained due to dilatory action on behalf of individuals in the executive branch.) If the Secretary was allowed to postpone action every time there was uncertainty as to some issue in IGRA or in a compact, the Secretary would be able to forestall approval of compacts indefinitely. Rather than allow this, Congress imposed an absolute forty-five day deadline, a deadline defendants failed to meet in this case.

**13.** Defendants ask this court to pretend that the compact was not "submitted" on March 5, 1992, the day it arrived in Asst. Secy. Brown's office. Rather, they would move the submission date to July 10, 1992, the day on which the Supreme Court of Kansas ruled. Under this reading of the word "submitted," plaintiffs' action of submitting the document in March was not a "submission;" however, more than four months later, they affirmatively submitted the compact *by doing nothing.* (Of course, the only activity on that date was in the Supreme Court of Kansas.) "To submit" is an active verb requiring some effort on the part of the person doing the submitting; thus, the court cannot countenance defendants' strained reading of such a simple word as "submitted" to include plaintiffs' inactivity on July 10.

which violated West Virginia constitution a federal question); *Oliphant v. Schlie,* 544 F.2d 1007 (9th Cir.1976), *rev'd on other grounds,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978) (validity of Washington's retrocession proclamation issued in violation of state law a federal question); *United States v. Brown,* 334 F.Supp. 536 (D.Neb. 1971) (validity of retrocession legislation approved in violation of Nebraska constitution a federal question); *Omaha Tribe of Nebraska v. Walthill,* 334 F.Supp. 823 (D.Neb.1971), *aff'd* 460 F.2d 1327 (8th Cir.1972) (same), *cert. den'd,* 409 U.S. 1107, 93 S.Ct. 898, 34 L.Ed.2d 687 (1973). Thus, it is for the federal court to determine whether the Governor's approval of the Tribal–State compact is sufficient for purposes of IGRA.

Plaintiffs argue that the present case is analogous to the line of retrocession [14] cases decided in the 1970s. In those cases, federal courts had to assess the validity of various legislative and executive measures dealing with jurisdiction of Indian lands. In these retrocession cases, an Executive Order required that the Secretary of the Interior publish in the *Federal Register* notice that a state had ceded jurisdiction over an Indian territory to the federal government. The underlying statute, however, did not specify what action of the state was necessary to trigger the Secretary's action; in other words, Congress did not specify what procedures a state needed to follow to cede jurisdiction over Indian lands.

Since the necessary procedures were unstated, in cases such as *United States v. Lawrence,* 595 F.2d 1149 (9th Cir.), *cert. den'd,* 444 U.S. 853, 100 S.Ct. 108, 62 L.Ed.2d 70 (1979), *Oliphant, Omaha Tribe,* and *Brown,* parties challenged several retrocession actions as contrary to state law. For instance, in *Brown* and *Omaha Tribe,* parties asserted that Nebraska's retrocession of jurisdiction, made effective by legislative resolution, was invalid because the resolution had

not first been presented to the Governor (as required by the Nebraska constitution). Similarly, in *Oliphant* and *Lawrence,* parties asserted that Washington's retrocession, made effective by the Governor's proclamation, similarly was invalid since only the legislature had the authority to approve such an action.

In each case, however, the federal court held that the retrocession agreement was valid *even if it violated state law.* The courts found that several factors contributed to this conclusion: 1) a desire to avoid forcing the Secretary of the Interior delving into complex questions of state law to determine whether the state's retrocession was valid as a matter of state law; 2) an attempt to avoid future nullification of accepted retrocession agreements due to subsequently passed legislation or unfavorable court determinations; and 3) a need for finality. *See, e.g., Brown,* 334 F.Supp. at 540.

Thus, plaintiffs argue, if the court deems the compact approved, even if only by statutory process, under these precedents the compact would be completely binding, regardless of the Supreme Court of Kansas' determination that the Governor did not have authority to conclude the compact.

Defendants counter these retrocession cases by citing *Washington v. Yakima Indian Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979). In that case, involving the cessation of jurisdiction over Indian lands from the federal government to the states under Pub.L. 280, the Supreme Court held that it was up to state law to determine what procedures a state needed to follow in order to amend its constitution. *See Yakima,* 439 U.S. at 493 n. 39, 99 S.Ct. at 751 n. 39.

For several reasons, the court rejects plaintiffs' argument that *Brown* controls here. First, there is a significant difference between this case and those cited by plain-

---

14. In 1953, Congress passed Public Law 280 by which states were allowed to assume civil and/or criminal jurisdiction over Indian lands from the federal government, usually without the consent of the Indians themselves. Act of Aug. 15, 1953, 67 Stat. 588–590. In 1968, Congress recognized that this law had failed to realize the stated goal of Pub.L. 280, that is, making Indians "first-class citizens." Thus, Congress amended Pub.L. 280 to require Indian consent before a state assumed jurisdiction over any Indian land and, more importantly as far as this case is concerned, to allow states to relinquish jurisdiction over Indian lands back to the federal government. This retransfer of jurisdiction from the states to the federal government is known as retrocession.

tiffs: in each of those cases, the Secretary of the Interior had *affirmatively accepted* the act of retrocession, however expressed. Here, by contrast, the Assistant Secretary merely postponed decision, and the approval of the compact is the result of a statutory approval procedure. In fact, the Assistant Secretary immediately informed the State and the Kickapoo Tribe that he could not accept the compact until the Kansas Supreme Court resolved the question of authority. For many of the reasons which distinguish this case from *Brown* (as summarized in the two following paragraphs), the court finds that an automatic (by operation of law) statutory approval following the Secretary's failure to act does not warrant the same consideration as an affirmative approval by the Secretary.

The court finds that the concerns underlying cases such as *Brown* are not present here. First, the problem of delving into state law was not a concern as the Supreme Court of Kansas was soon to answer the question for the Secretary. Second, the issue regarding future nullification of an accepted agreement is not relevant as the Secretary never accepted the compact. And, third, the question of finality never came into play since neither the State of Kansas nor the Kickapoo Tribe has begun to operate under the terms of the compact. Thus, the concerns which supported the *Brown* decision are not implicated here, and that line of cases does not apply.

Moreover, the court questions the validity of *Brown* and its progeny in light of *Yakima* and recent developments in the judiciary. As mentioned above, the Supreme Court in

*Yakima* acknowledged that the issue regarding appropriate state procedures was a question of state law. The court today maintains that the determination of *acceptance* on the part of federal officials still is a question of *federal* law. However, the court is not comfortable in disregarding a decision of the Supreme Court of Kansas and binding the state to a compact entered into without appropriate authority.[15]

Therefore, the court concludes that the *Brown* line of cases does not apply; as a result, the court holds that the compact is not binding, even though it is deemed approved by operation of statute.

Thus, the court concludes that the State of Kansas never entered into a compact as required by 25 U.S.C. § 2710(d)(8)(A).[16] The court accepts the determination of the Supreme Court of Kansas that the Governor did not have the authority to bind the State. As discussed above, the compact may be deemed approved only to the extent that it comports with IGRA. § 2710(d)(8)(C). And, because only the Governor—a person without authority—signed the compact, the State did not enter into the compact. Thus, the compact does not comply with § 2710(d)(8)(A) and is invalid.

In sum, although the compact initially is deemed approved due to the statutory mechanism of § 2710(d)(8)(C), it ultimately is invalid due to the fact that it conflicts with § 2710(d)(8)(A). The court therefore must deny plaintiffs the relief they seek and grant defendants' motion for summary judgment.[17]

## III. CONCLUSION.

Congress passed IGRA for several reasons, one of the most important of which was

---

**15.** The court is charged with upholding the law, and in a case of first impression in this circuit (as this one is), the court's duty is to apply the law as it anticipates the Court of Appeals and the Supreme Court would rule. (To do otherwise would prolong litigation to the detriment of the parties and the judicial system.) The court must acknowledge that even though a *Brown*-like solution might be favorable in this case, it would not be adopted by either appellate court.

**16.** This determination is one defendants could have, but did not, make during the forty-five day statutory approval period. At the time the compact was first submitted to defendants, defendants had an obligation under the statute to treat

it as a submitted compact under § 2710(d)(8)(A); after all, it was signed by both the Chairman of the Kickapoo Tribe and the Governor of the State of Kansas on behalf of the State. As discussed above, defendants had a statutory duty to approve or disapprove of the compact within forty-five days; as they failed to do so, the compact is deemed approved by operation of statute. § 2710(d)(8)(C).

**17.** Part of the relief plaintiffs seek is a writ of mandamus directing defendants to publish notice of the approval of the compact in the *Federal Register*. As the court finds that the compact is invalid, no publication is warranted and the request for a writ of mandamus is inappropriate.

to ensure that states and Indian tribes approached gaming in good faith. In the first part of 1992, Gov. Finney, on behalf of the State of Kansas, upheld her responsibility in negotiating the compact. However, the Secretary of the Interior (or his designate) failed to fulfill mandatory, unambiguous statutory duties under IGRA by failing to even consider a Tribal–State compact signed by the highest executive official in both the Kickapoo Tribe and the State of Kansas.

However, the compact may be deemed approved only to the extent it comports with IGRA. Since the Supreme Court of Kansas has determined that the Governor did not have the authority to bind the State of Kansas, the State of Kansas never entered into the compact and the compact cannot be deemed approved under § 2710(d)(8). Therefore, the entry of summary judgment for defendants is appropriate.

As a final note, the court is disturbed at the events which have precipitated this lawsuit. In this case, the State of Kansas has been dilatory in negotiating with the Kickapoo Tribe, thus forcing the Tribe to bring federal lawsuits to enjoy rights granted to them by the Congress.

Under the law, the court cannot give plaintiffs the relief they seek. However, the court hopes that Congress will recognize that IGRA, as currently drafted, fails to achieve the goals Congress had intended and amend the statute.[18] Only then will tribes, like plaintiffs here, finally reap the benefits Congress intended they receive. In the absence of amendments, states can continue to thwart congressional intent.

An appropriate order accompanies this memorandum opinion.

## ORDER AND FINAL JUDGMENT

This case comes before the court on plaintiffs' motion for summary judgment; and defendants' motion to dismiss or, in the alternative, for summary judgment. Upon consideration of the representations of counsel, both in their briefs and at oral argument in open court, and for the reasons stated in the accompanying memorandum opinion, it is hereby ORDERED that:

1. Defendants' motion to dismiss is DENIED; however, defendants' motion, in the alternative, for summary judgment is GRANTED.

2. Plaintiffs' motion for summary judgment is DENIED.

3. The Clerk shall enter FINAL JUDGMENT for defendants.

SO ORDERED.

---

18. Given the State of Kansas' position in the parallel suit in the District Court in Kansas, it is apparent that one of the most important amendments would be one to clarify that Congress intended to remove the states' sovereign immunity to suit for purposes of IGRA.